OPINION
{¶ 1} Defendants-appellants Creekside Health Center and Anthony N. Pannozzo, M.D., appeal the jury verdict rendered in the Mahoning County Common Pleas Court in favor of plaintiff-appellee Gretchen Julian. Multiple issues are presented in this appeal. The first issue presented is whether the trial court erred in failing to grant a JNOV, new trial and/or remittitur on the issue of compensatory and punitive damages. Next, we are to consider whether the awards of punitive and compensatory damages were against the manifest weight of the evidence. The third issue is whether Julian's alleged failure to list this suit as an asset on her personal bankruptcy barred the trial court from ruling on the case. Lastly, we must decide whether the trial court abused its discretion in awarding attorney fees and prejudgment interest. For the following reasons, the judgment of the trial court is affirmed.
 STATEMENT OF FACTS {¶ 2} Pannozzo is a physician who operates a health and fitness center known as Creekside Health and Fitness. In 1998, Creekside was looking for a fitness and health director, thus it placed an advertisement in the Youngstown Vindicator. Julian responded to the ad. She was subsequently interviewed and eventually hired by Pannozzo to be the director at Creekside.
 {¶ 3} The uncontroverted terms of her employment were that she was to start full-time December 1, 1999 and she would make $55,000 a year. The parties also agreed that Julian would begin working in November without pay, but during this month she would only work weekends and a few other days (by using vacation days at the job she was leaving to work at Creekside). It is disputed as to whether she was an at-will employee or whether the parties had an understanding that they would enter into a contract guaranteeing her a year of employment.
 {¶ 4} Julian began working full-time on December 1, 1999, however, on December 6, 1999, her employment ended. It is disputed as to whether she quit or whether she was fired. On January 31, 2000, Julian filed suit against appellants claiming breach of contract, fraud, promissory estoppel, intentional interference with business relations and discharge in violation of public policy. On November 15, 2002, appellants stipulated to the issues of liability on all the above claims. Thus, the only issue the jury was left to decide was the amount of damages.
 {¶ 5} The jury trial began on December 3, 2002, and judgment was entered on December 6, 2002. The jury awarded Julian $70,000 in actual damages, $90,000 in punitive damages plus attorney fees and costs. Appellants then filed their combined motion for judgment notwithstanding the verdict (JNOV), new trial and remittitur that were summarily overruled by the trial court on February 10, 2003. On July 2, 2003, the trial court awarded attorney fees in the amount of $76,317.50. Julian had also filed a motion for prejudgment interest that was granted on June 27, 2003. Appellants timely appealed the jury verdict and the trial court's rulings raising four assignments of error.
 ASSIGNMENT OF ERROR NUMBER ONE {¶ 6} "Whether the trial court erred and abused its discretion in summarily denying appellants post-trial motions (judgment notwithstanding the verdict, new trial and remittitur)."
 {¶ 7} Appellants present different arguments as to why the trial court erred in denying the JNOV, the new trial motion and the remittitur. As such, each argument will be addressed separately.
 A. JNOV {¶ 8} A motion for JNOV tests the legal sufficiency of the evidence and, therefore, presents a question of law that is reviewed de novo.Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm, 73 Ohio St.3d 107,108, 1995-Ohio-214; Grau v. Kleinschmidt (1987), 31 Ohio St.3d 84, 90. Where there is substantial competent evidence favoring the nonmoving party so that reasonable minds might reach different conclusions, a trial court acts properly in denying the motion for JNOV. Ramage v. CentralOhio Emergency Serv., Inc., 64 Ohio St.3d 97, 109, 1992-Ohio-109. However, if after construing the evidence most strongly in favor of the nonmoving party, the trial court finds that reasonable minds could come to but one conclusion and that conclusion is adverse to the nonmoving party, then the motion for JNOV must be granted. Id.
 {¶ 9} Appellants argue that Julian was not entitled to punitive damages as a matter of law and that the compensatory damages were improper in light of the evidence and the amount of actual damages. These arguments will be addressed separately.
 1. PUNITIVE DAMAGES {¶ 10} The Supreme Court has stated that "[t]he purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct." Moskovitz v. Mt. Sinai Med. Ctr., 69 Ohio St.3d 638, 651,1994-Ohio-324. However, the amount of punitive damages awarded may be excessive when it is determined to have been the product of passion and prejudice. See Villella v. Waikem Motors, Inc. (1989), 45 Ohio St.3d 36
(stating "[a] jury verdict as to punitive damages which is not the result of (1) passion and prejudice or (2) prejudicial error will not be reduced on appeal"). If the punitive damages award is not the result of passion and prejudice, and not the result of a legal error, it is generally not within the province of a reviewing court to substitute its view for that of the jury. Id. at 40.
 {¶ 11} The focus of the award of punitive damages should be the defendant, with due consideration of what it will take to bring about the twin aims of punishment and deterrence as to that defendant. Dardingerv. Anthem Blue Cross Blue Shield, 98 Ohio St.3d 77, 2002-Ohio-7113, at ¶ 178. As the Supreme Court explained:
 {¶ 12} "We do not require, or invite, financial ruination of a defendant that is liable for punitive damages. While certainly a higher award will always yield a greater punishment and a greater deterrent, the punitive damages award should not go beyond what is necessary to achieve its goals. The law requires an effective punishment, not a draconian one." Id.
 {¶ 13} Punitive damages are available upon a finding of actual malice. Calmes v. Goodyear Tire Rubber Co. (1991), 61 Ohio St.3d 470. Actual malice is "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." Preston v. Murty (1987),32 Ohio St.3d 334.
 {¶ 14} Appellants argue that the testimony at trial does not establish that Dr. Pannozzo acted with actual malice, and thus a punitive damages award was not available. Many of appellants' arguments concerning actual malice center on their belief that Julian was an at-will employee. Appellants contend that if, as they believe, Julian was an at-will employee, she could at any time be terminated with or without cause. Therefore, her termination would not constitute actual malice.
 {¶ 15} Their argument is misguided. Appellants stipulated to all causes of action for liability, which included breach of contract, wrongful discharge and fraud. In stipulating to the breach of contract claim, appellants implicitly admitted that there was a contract for employment. Granted we are unaware of the terms of the contract. However, the fact remains that you cannot logically admit to causing a breach of contract and later contend there was no contract at all. Likewise, appellants' stipulation to wrongful discharge is an admission that it discharged Julian in violation of a public policy and thus was wrongful. Finally, appellants also stipulated to fraud, where punitive damages are available if actual malice is shown.
 {¶ 16} Thus, given that explanation, any argument as to her status of an at-will employee or a contract employee is inconsequential. The factual pattern necessary to open the door for punitive damages was stipulated. Therefore, our focus is directed to whether the breach of contract, wrongful discharge and/or fraud was done with actual malice.
 {¶ 17} Pam Pannozzo, Dr. Pannozzo's daughter and at the time of Julian's termination was helping to get the facility up and running, terminated Julian. (Tr. 236). In terminating Julian, Pam told her she was a "cancer to this organization." (Tr. 243-246). She testified that she had her father's approval to fire Julian. (Tr. 247). However, Dr. Pannozzo was not in the room at the time of the termination. (Tr. 218, 247).
 {¶ 18} Dr. Pannozzo testified at trial that he was not proud of Pam for firing Julian. (Tr. 222). However, his deposition testimony was read into the record and at that deposition when asked whether he was proud of Pam for firing Julian he answered "I think so, yeah." (Tr. 222). (Much of Dr. Pannozzo's testimony is like this, he would say one thing at trial and then Julian's attorney would use the deposition to show that he said the opposite thing during the deposition.) Additionally, there was testimony that Julian had left a secured position to work for Dr. Pannozzo in what she believed would be long term employment. Dr Pannozzo even acknowledged in deposition testimony that she had left a secured position and that was why she wanted a one year contract rather than a terminable at-will contract. (Tr. 199 — his testimony at trial was the opposite, but the deposition was used to show the two different answers).
 {¶ 19} The question then becomes: is this evidence sufficient to sustain a jury charge for punitive damages? Appellants never objected to the jury instruction on punitive damages, thus they waive all but plain error. While the plain error doctrine may allow courts of review to consider under certain limited circumstances issues deemed waived, the Ohio Supreme Court has made it clear that a "plain error" review is not favored in civil cases. Goldfuss v. Davidson (1997), 79 Ohio St.3d 116,122. The Court in Goldfuss explained:
 {¶ 20} "Parties in civil litigation choose their own counsel who, in turn, choose their theories of prosecuting and defending. The parties, through their attorneys, bear responsibility for framing the issues and for putting both the trial court and their opponents on notice of the issues they deem appropriate for jury resolution." Id., citing Gallagherv. Cleveland Browns Football Co. (1996), 74 Ohio St.3d 427, 433.
 {¶ 21} In civil appeals, review for plain error should be undertaken, "only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." Goldfuss, 79 Ohio St.3d at 122-123.
 {¶ 22} The matter at hand is not an exceptional circumstance. The above testimony as to how Julian was fired and that she had left a secured position to work for appellants and then was almost immediately fired, when viewed in the light most favorable to Julian, could lead reasonable minds to reach different conclusions as to whether actual malice was present. Thus, the trial court did not err when it denied the JNOV as to the punitive damages award. Ramage, 64 Ohio St.3d at 109. Appellants argument fails.
 2. COMPENSATORY DAMAGES {¶ 23} The jury returned a verdict of compensatory damages in the amount of $70,000. During trial, Julian testified that she lost $30,400 for the year when she was terminated from employment with Creekside. (Tr. 332). She was hired at Kent State University (KSU) on March 17, 2000, approximately four months after she lost her job with appellants. (Tr. 326). Currently, her pay rate at KSU is $38,000 a year, $17,000 less than she would make at Creekside. (Tr. 333).
 {¶ 24} Appellants argue that under an employment breach of contract theory that Julian is only permitted to recover the amount of money she would have received if she would have continued to work for Creekside. Under this argument, appellants believe, that at most, in compensatory damages Julian could recover $30,400.
 {¶ 25} Julian argues that while appellants statement of law is correct on an employment breach of contract theory, appellants are selectively forgetting that they also stipulated to fraud, promissory estoppel, intentional interference with business relations, and discharge in violation of public policy. Moreover, Julian argues that the complaint was not restricted to lost income for one year, but rather additionally claimed future damages and mental anguish for losing her job.
 {¶ 26} The jury instruction included a statement that compensatory damages are not restricted to actual loss of money, but also included mental and economic aspects of the injury. (Tr. 455). Furthermore, the instruction stated that she was entitled to recover future lost wages. (Tr. 456). Appellants did not object to the future loss instruction.
 {¶ 27} The Supreme Court has noted that damages attributable to mental anguish and humiliation are available under compensatory damages; however, value of such damages are notoriously difficult to prove.Columbus Finance, Inc. v. Howard (1975), 42 Ohio St.2d 178, 184. Also, courts have stated that "loss of future profits may be recovered as part of a claim of compensatory damages in an action for tortious interference with contract." UZ Engineered Products Co. v. Midwest Motor Supply Co.,Inc., 147 Ohio App.3d 382, 401, 2001-Ohio-8779, citing Premix, Inc. v.Zappitelli (N.D.Ohio, 1983), 561 F. Supp. 269, 278. This proposition of law should equally apply to intentional interference with business relations, as both causes of action are similar. See Restatement of the Law 2d, Torts (1977), Sections 766, 766A, 766B (dealing with both causes of action). See, also, Kenneth J. Majcen Associates, Inc. v. PhoenixAssociates, Inc., 8th Dist. No. 76454, 2001-Ohio-4121 (discussing intentional interference with contact and intentional interference with business relations as in the Restatement). Thus, lost future wages and damages for mental anguish are available under compensatory damages. Consequently, appellants' argument that the compensatory damages are to be confined only to wages lost during the alleged one year contract period fails.
 {¶ 28} Furthermore, the interrogatories given to the jury did not ask the jury to specify which amount of the $70,000 was for future losses, for mental anguish or for loss of wages for the first year. Additionally, there were no interrogatories asking the jury to apportion the loss according to the various causes of action that were stipulated to by appellants. Thus, it is unclear how the jury apportioned the damage award. Therefore, we are unable to determine whether any of the award was in error. Thus, this argument fails. Accordingly, the trial court did not err in denying the motion for JNOV on punitive and compensatory damages.
 B. NEW TRIAL {¶ 29} Civ.R. 59(A) lists the grounds upon which a new trial may be granted. The decision to grant a new trial rests within the trial court's sound discretion and will not be reversed on appeal absent an abuse of that discretion. Malone v. Courtyard by Marriott L.P., 74 Ohio St.3d 440,448, 1996-Ohio-311. The term "abuse of discretion" implies more than an error in law or judgment; it implies that the trial court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
 {¶ 30} Appellants argue that the trial court's denial of the motion for a new trial was "manifestly contrary to the evidence and resulted in a complete violation of justice." Nine arguments are set forth by appellants explaining why, in their opinion, a new trial should have been granted.
 1. JUROR BIAS {¶ 31} Appellants contend that one of the "jurors was biased because he had prior dealings with Dr. Pannozzo" and another juror was biased because he "was related to the trial court judge." (Tr. 5, 15). These arguments fail.
 {¶ 32} First, Juror Conway is the brother of Judge Cronin's brother-in-law. However, this was disclosed to both parties during voir dire. (Tr. 5). Also, it is clear from the record that the trial judge and Juror Conway did not discuss the cases that are pending in the court. (Tr. 5). Moreover, neither party objected or tried to remove Juror Conway. Thus, all but plain error is waived. State v. Lewis,67 Ohio St.3d 200, 1993-Ohio-181 (stating a failure to object in the trial court to the claimed error waives that objection, absent plain error). However, as explained earlier, plain error review is not favored in civil cases unless it is an exceptional circumstance. Goldfuss,79 Ohio St.3d at 122.
 {¶ 33} As stated above, this is not such an exceptional circumstance. The trial court's failure to remove Juror Conway when no party moved for his removal does not amount to plain error. The record is devoid of any indication that he could not be a fair and impartial juror or that he would not follow the law as given to him by the court. See State v.Duerr (1982), 8 Ohio App.3d 404, paragraph two of the syllabus (stating that when a juror can be fair and impartial, that juror should not be removed from the jury). Therefore, the failure to remove this juror without a motion to remove this juror does not amount to plain error.
 {¶ 34} Regarding Juror Clayton, who had prior dealings with Dr. Pannozzo, the trial court did not err when it failed to remove him. The record reveals that Dr. Pannozzo was a friend of Juror Clayton's in-laws. However, Juror Clayton did not know whether his in-laws were still friends with Dr. Pannozzo. (Tr. 15). When asked if he could be fair and impartial he stated that he could. (Tr. 56).
 {¶ 35} Given this testimony, there was no reason to remove Juror Clayton since there was no indication that he could not be fair or impartial. Id. Furthermore, as in the instance above, appellants did not try to remove Juror Clayton from the jury through either a peremptory challenge or through a challenge for cause. Thus, plain error must be shown to prevail on this argument. As above, appellants do not meet this standard. Consequently, these arguments fail.
 2. IMPROPER COMMENTS ABOUT APPELLANTS {¶ 36} Next, appellants argue that the trial court made improper comments about Dr. Pannozzo and Creekside. This argument is based upon Civ.R. 59(A)(1) that the proceedings of the court prevented them from having a fair trial.
 {¶ 37} The first comment complained about is the trial judge's instruction to the jury to avoid going to Creekside for lunch during the trial. (Tr. 296). As Julian correctly states, this is nothing more than a common sense instruction. The jury's determination in the case should not be based on what the facility is like or their own inspection of the facility. Rather, it should be based on the evidence in the courtroom. Instructing a jury to avoid Creekside for lunch is analogous to an instruction to not talk about the case; it keeps jurors from being influenced by outside sources. Thus, this complaint has no validity.
 {¶ 38} The other comment appellants fault are contained in the following trial colloquy:
 {¶ 39} "The Court: Doctor. Doctor.
 {¶ 40} "A. Look, this was under duress. I had a lawyer that took me outside and beat me over the head for 15 minutes.
 {¶ 41} "The Court: That might happen again. If you would look at the question and agree that that's the way the answer reads?" (Tr. 208).
 {¶ 42} This statement was made because Dr. Pannozzo would not answer the questions as they were asked despite repeated instructions from the court to do so. Although it may have been better if the trial judge refrained from making the comment that it did, the statement alone did not deny appellants the right to a fair and impartial trial. Williams v.Waller (Dec. 26, 1996), 8th Dist. No. 69069 (stating that while it would have been better if the trial judge refrained from making comments, the entire record did not indicate that the trial judge exhibited bias or ill-will towards appellant). A full review of the record does not indicate to this court that the trial court exhibited bias or ill-will towards appellants. Thus, this argument also has no merit.
 3. STRIKING CERTAIN TESTIMONY OF PAM PANNOZZO {¶ 43} The following testimony of Pam Pannozzo was struck from the record:
 {¶ 44} "Q. Did you fire Gretchen?
 {¶ 45} "A. I believe I fired Gretchen. There's a question as to whether or not I had authority to fire Gretchen, and I did, and I fired her because she wasn't getting the job done. Simple as that. I believe I was acting properly because she confirmed with me in the conversation this contract was terminable at-will by either party." (Tr. 236).
 {¶ 46} The court struck the answer from the record based upon the stipulation that had been entered by the parties that a breach of contract had occurred. (Tr. 237). This testimony was elicited upon cross-examination. In appellants' opinion, since Julian asked the question, she opened the door to this line of questioning and thus the answer should not have been struck.
 {¶ 47} The question asked was did Pam fire Julian, not why did she fire her. The only part of the answer that was responsive to the question was the first sentence. The rest of her answer addresses the question of whether there was a breach of contract. However, appellants stipulated that there was a breach of contract, thus, given the stipulation whether or not Julian was "getting the job done" and whether she was an at-will employee or a contract employee was irrelevant. Thus, the trial court did not abuse its discretion when it struck the answer. This argument fails.
 4. ALLOWING TESTIMONY ABOUT PAM'S RELATIONSHIP WITH HER FATHER {¶ 48} Pam testified that her relationship with her father was tumultuous. (Tr. 233). She explained that yelling and screaming confrontations occurred between herself and her father. She also stated that there were physical confrontations. Appellants' counsel did not object to any of this testimony until the question was asked as to whether she had to call the police on her father. (Tr. 232). It was not until later in trial that appellants' counsel moved for a mistrial based upon the testimony. (Tr. 297-303). The trial court overruled the motion and stated that if appellants wanted to put Dr. Pannozzo back on the stand and rehabilitate him that was permitted. (Tr. 303). Appellants decided not to put Dr. Pannozzo back on the stand
 {¶ 49} Appellants' failure to object to the testimony in question waives all but plain error. The trial court's inaction to restrict this testimony on its own action does not amount to plain error. The result of the trial would not have been clearly different had the court struck this allegedly objectionable testimony and given the jury an admonishing instruction. See State v. Long (1978), 53 Ohio St.2d 91. Given all the testimony, stipulations and evidence at trial, this testimony alone, even if it is objectionable, did not change the outcome of the trial. Thus, this argument also fails.
 5. DEPOSITION OF DR. PANNOZZO USED AT TRIAL {¶ 50} Appellants' argument concerns the use of Dr. Pannozzo's deposition at trial. They claim that the deposition was essentially read into the record and this was improper given Evid.R. 611(A). Evid.R. 611(A), in pertinent part, states that the court controls the mode and order of interrogating witnesses so that it can protect the witnesses from harassment and undue embarrassment. Appellants claim the reading of Dr. Pannozzo's deposition into the record was for the sole purpose of causing him embarrassment.
 {¶ 51} This argument is completely without merit. After reading Dr. Pannozzo's entire testimony it becomes abundantly clear that the use of his deposition was not to cause him embarrassment; rather, it was for the purpose of impeachment. His answers at trial were the exact opposite of the answers he gave during the deposition. (Tr. 193-196, 202-203, 204-205, 207-215, 217-218, 219-222).
 {¶ 52} Evid.R. 613 provides for the admission of a prior inconsistent statement for impeachment purposes. Deposition testimony is considered a prior statement. Keeney v. SuperAmerica (Mar. 5, 1998), 4th Dist. No. 97CA4. Thus, even when appellants' counsel objected to the use of the deposition testimony (which was only about 50% of the time) the trial court did not abuse its discretion in overruling the objection. This argument has no merit.
 6. STIPULATIONS {¶ 53} Next, appellants contend that the trial court erred in making a finding that the parties stipulated to liability when Dr. Pannozzo, in their opinion, attempted to revoke the stipulations and defend the case of the merits. Appellants cite to the transcript to what they believe are examples of these revocations.
 {¶ 54} "[A] stipulation is a voluntary agreement between opposing counsel concerning disposition of some relevant point so as to obviate the need for proof or to narrow the range of litigable issues." DeStephenex rel. DeStephen v. Allstate Ins. Co., 10th Dist. No. 01AP-1071, 2002-Ohio-2091, at ¶ 17, quoting Horner v. Whitta (Mar. 16, 1994), 3d Dist. No. 13-93-33. Once entered into by the parties, filed with and accepted by the court, a stipulation is binding upon the parties and is a fact deemed adjudicated for purposes of determining the remaining issues in the case. Whitehall ex rel. Fennessy v. Bambi Motel (1998),131 Ohio App.3d 734, 742. A party who has agreed to a stipulation cannot unilaterally retract or withdraw from it. Horner, 3d Dist. No. 13-93-33. A party can only withdraw from a stipulation with the consent of the other party or by leave of court upon good cause. In the Matter of Body
(June 23, 1998), 5th Dist. No. 97CA33. The trial court has discretion to grant or deny a request for withdrawal of a stipulation. Morris v.Continental Ins. Cos. (1991), 71 Ohio App.3d 581, 589, citing Ish v.Crane (1862), 13 Ohio St. 574, 580.
 {¶ 55} Here, Julian did not agree to the withdrawal from the stipulations. Therefore, the only way the stipulations could have been revoked was through leave of the court. The record is completely devoid of any explicit request for the withdrawal of the stipulations. Rather, the record reveals that during both opening and closing arguments, appellants referenced the existence of the stipulations. (Tr. 166, 430).
 {¶ 56} Appellants argue that statements made by Dr. Pannozzo are an implicit indication of his desire to move to withdraw the stipulation. He stated that the only thing he did was hire a bad person, and that he did not fire Julian, she quit. (Tr. 198, 208). Appellants claim these statements go to arguments of whether Julian was wrongfully discharged or if her contract was breached. Thus, they contend this is an implicit request for a revocation of the stipulations. This arguments fails. Regardless of Dr. Pannozzo's statements, the fact remains that appellants never moved to withdraw the stipulations. As such, given the above testimony alone, we will not conclude that the trial court erred in failing to withdraw the stipulation, especially when considering that there was never a formal motion to withdraw. Thus, this argument also lacks merit.
 7. EXCESSIVE DAMAGES RESULTING FROM PASSION OR PREJUDICE {¶ 57} Appellants argue that the punitive damages award was excessive in light of the evidence and the compensatory damages were the result of the jury's passion or prejudice. Therefore, according to appellants, a new trial was required by Civ.R. 59(A)(4), (5). Appellants reference the arguments made earlier about punitive and compensatory damages.
 {¶ 58} As was discussed earlier, the evidence could be perceived to support the punitive damages award. Furthermore, Ohio courts have held that doubling the amount of compensatory damages for a punitive damages award is not excessive. Dardinger, 2002-Ohio-7113, at ¶ 183, citingPoske v. Mergl (1959), 169 Ohio St. 70, 75, citing Steiner v. Custer
(1940), 137 Ohio St. 448; Klever v. Reid Bros. Express (1951),154 Ohio St. 491. The award in this matter is not even double the amount of compensatory damages. Thus, the trial court did not abuse its discretion in failing to award a new trial on this basis.
 {¶ 59} Likewise, it did not error in failing to award a new trial on the basis that the compensatory damages were a product of the jury's passion or prejudice. As aforementioned, there were no jury interrogatories. Thus, it is unclear as to how the jury apportioned the loss among the various causes of action and for future losses, mental anguish and for the lost wages for the year of her contract with appellants. Accordingly, the trial court did not abuse its discretion in failing to award a new trial on these issues.
 8. DAMAGE AWARD NOT SUSTAINED BY WEIGHT OF EVIDENCE {¶ 60} Under this argument, appellants contend that the evidence does not support a finding for actual malice and thus a new trial should have been granted. However, this argument is also set forth in the next assignment of error, and as such will be addressed then.
 9. INSTRUCTION ON FUTURE DAMAGES {¶ 61} The last argument made by appellants under this section is that the trial court erred in instructing the jury on future damage. As explained above, appellants did not object to the jury instruction on future damages. The failure to object waives all but plain error. The instruction on future damages does not amount to plain error. As was discussed above under section (A)(2), an instruction on future damages was warranted and thus would not constitute plain error. UZ EngineeredProducts Co., 147 Ohio App.3d at 401, Restatement of the Law 2d, Torts (1977), Sections 766, 766A, 766B. Accordingly, this argument fails.
 C. REMITTITUR {¶ 62} We review a trial court's decision to deny remittitur under an abuse of discretion standard. See Betz v. Timken Mercy Med. Ctr. (1994),96 Ohio App.3d 211, 218. "The assessment of damages is a matter within the province of the jury." Carter v. Simpson (1984), 16 Ohio App.3d 420,423. It is not proper for the reviewing court to substitute its opinion for that of the jury. Litchfield v. Morris (1985), 25 Ohio App.3d 42,44. The denial of a motion for remittitur is not erroneous unless the award is so excessive as to appear to be the result of passion or prejudice on the part of the jury, or unless the amount awarded is excessive and against the manifest weight of the evidence. Id.; Cox v.Oliver Machinery Co. (1987), 41 Ohio App.3d 28. To reverse the jury's damage award, it must appear to be "so disproportionate as to shock reasonable sensibilities." Jeanne v. Hawkes Hosp. of Mt. Carmel (1991),74 Ohio App.3d 246, 258. If a trial court determines that a damage award is excessive, but not influenced by passion or prejudice, then the court can present the plaintiff with the option of accepting a reduced amount of damages (a remittitur) or choosing a new trial on the issue of damages. Kalbfell v. Marc Glassman, Inc., 7th Dist. No. 02CO5, 2003-Ohio-3489, citing Wightman v. Consolidated Rail Corp.,86 Ohio St.3d 431, 444, 1997-Ohio-119.
 {¶ 63} As we have previously held, the award was not excessive, therefore, a remittitur is not warranted. This argument lacks merit.
 ASSIGNMENT OF ERROR NUMBER TWO {¶ 64} "WHETHER THE JURY'S VERDICT WAS NOT SUSTAINED BY THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS CONTRARY TO LAW."
 {¶ 65} "When evaluating whether a judgment is against the manifest weight of the evidence in a civil context, the standard of review is the same as that in the criminal context." Snader v. Job Master Svcs.
(2000), 136 Ohio App.3d 86, 89. Thus, this court must, when reviewing the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52.
 {¶ 66} Appellants argue the award of actual and punitive damages are not supported by the evidence. They incorporate by reference all arguments made under the first assignment of error in support of this argument. Likewise, Julian also incorporates by reference all arguments made in response to the first assignment of error in support of this argument.
 {¶ 67} With regard to the award of punitive damages, testimony was offered that Julian left a secure job to work for appellants under the belief that it would be at least a year's employment, if not more. Testimony also indicated that Julian was fired only after working a short time, i.e. 6 days full-time. When she was fired, she was called the "cancer of the organization" and Dr. Pannozzo was proud of Pam for firing Julian. While our opinion as to whether we would award punitive damages given these facts may differ from that of the jury, we will not substitute our opinion for that of the jury when there is some competent, credible evidence that could infer the element of actual malice. Given this testimony, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice in awarding punitive damages.
 {¶ 68} Regarding the compensatory damages, testimony and evidence indicated that Julian lost around $30,400 for the year she believed she would be working at Creekside. Also, she testified that she was humiliated when she was fired because she was never fired from a job and had always had outstanding performance reviews. This was confirmed from testimony of a prior employer and the promotions she has received at her current employment. She also testified that currently she is making $38,000 a year at KSU. This is $17,000 a year less than she would make at Creekside if her employment had continued, where she testified she had every intention of staying until she retired. Given all of this testimony, we cannot conclude that $70,000 in compensatory damages was against the manifest weight of the evidence.
 {¶ 69} Consequently, we do not find that the damage award was against the manifest weight of the evidence. This assignment of error lacks merit.
 ASSIGNMENT OF ERROR NUMBER THREE {¶ 70} "Whether the court erred as a matter of law in failing to dismiss appellee's claim where the undisputed testimony indicated that appellee had filed a previous chapter 7 bankruptcy and had failed to include her claim against appellants as an asset of the bankruptcy estate."
 {¶ 71} Appellants argue that the doctrine of equitable estoppel bars Julian from asserting any claims against them. At trial, it was revealed that Julian had filed for bankruptcy. Appellants contend that they were not listed on the bankruptcy as a claim or debt as is required by bankruptcy laws. Therefore, according to them, she is not now allowed to assert claims against them.
 {¶ 72} Julian counters this argument stating that the doctrine of equitable estoppel is an affirmative defense and therefore was required to be asserted in the answer. She argues that since it was not asserted in the answer, the defense is waived. In the alternative, she argues that there is no evidence in the record to support the affirmative defense of equitable estoppel.
 {¶ 73} The Eighth District has stated the following about bankruptcy and the disclosure of any potential claim against another party:
 {¶ 74} "`A long-standing tenet of bankruptcy law requires one seeking benefits under its terms to satisfy a companion duty to schedule, for the benefit of creditors, all his interests and property rights.' OneidaMotor Freight v. United Jersey Bank (C.A. 3, 1988), 848 F.2d 414, 416. `It has been specifically held that a debtor must disclose any litigation likely to arise in a non-bankruptcy context.' Id. at 417. Such cause of action is the property of the estate, whether or not the cause of action is substantively valid. In re Michigan Real Estate Ins. Trust (E.D.Mich. 1988), 87 B.R. 447. `The result of a failure to disclose such claims triggers application of the doctrine of equitable estoppel, operating against a subsequent attempt to prosecute the actions.' Oneida, supra, at 417; In re H.R.P. Auto Ctr., Inc. (N.D.Ohio 1991), 130 B.R. 247; Matterof Freedom Ford, Inc. (M.D.Fla. 1992), 140 B.R. 585." Bruck Mfg. Co. v.Mason (1992), 84 Ohio App.3d 398, 400.
 {¶ 75} Thus, given the above, it appears that Julian was required to disclose her potential litigation to the Bankruptcy Court if at the time of filing for bankruptcy this action was likely to arise. However, despite this requirement there are procedural and substantive errors with the defense of equitable estoppel.
 {¶ 76} First, procedurally, appellants waived the affirmative defense of equitable estoppel. The Ohio Supreme Court has held that a party must assert a claim for estoppel in his pleadings. Neitz v. Village ofLakemore (2000), 9th Dist. No. 19730, citing Globe Indemnity Co. v.Wassman (1929), 120 Ohio St. 72, paragraph one of the syllabus. See, also, Civ.R. 8(C) and 12(H); Pocius v. Stankus (Oct. 26, 1994), 9th Dist. Nos. 16759, 16812, citing Mossa v. Western Credit Union, Inc.
(1992), 84 Ohio App.3d 177, 181 (holding that failure to set forth an affirmative defense in a responsive pleading constitutes waiver of that defense). Failure to plead the affirmative defense of estoppel in a responsive pleading under Civ.R. 8(C) or by amendment under Civ.R. 15 constitutes a waiver of that defense under Civ.R. 12(H). Jim'sSteakhouse, Inc. v. Cleveland, 81 Ohio St.3d 18, 20, 1998-Ohio-440; Stateex rel. The Plain Dealer Publishing Co. v. Cleveland, 75 Ohio St.3d 31,33, 1995-Ohio-0594; Houser v. Ohio Historical Society (1980),62 Ohio St.2d 77, 79 (stating that Ohio courts have consistently held that the failure to plead an affirmative defense constitutes a waiver of that defense); McSweeney v. Jackson (1996), 117 Ohio App.3d 623, 628-29.
 {¶ 77} Appellants did not assert in any responsive pleading the affirmative defense of equitable estoppel. Consequently, they effectively waived that defense and cannot now assert it on appeal. Mary D. v. FrankH. (Nov. 30, 2000), 6th Dist. No. L-00-1005 (discussing the defenses of estoppel and laches).
 {¶ 78} Appellants claim that the defense is not waived because certain defenses can be raised at trial and that Civ.R. 15(B) allows liberal amendment of the pleading at trial where justice requires. While it is true that some defenses may be raised for the first time at trial, Civ.R. 12(H)(2) limits the defenses to which this applies. Civ.R. 12(H)(2) states that a "defense of failure to state a claim upon which relief can be granted, a defense of failure to join a party indispensable under Rule 19, and an objection of failure to state a legal defense to a claim may be made * * * at the trial on the merits." Asserting the affirmative defense of estoppel is not included in this list, thus Civ.R. 12(H) does not save their claim.
 {¶ 79} Furthermore, Civ.R. 15(B) does not save the defense. Civ.R. 15(B) states in pertinent part "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." The issue as to estoppel was not actually tried by the parties. No evidence was admitted as to when the bankruptcy was filed. From the record it can only be determined that Julian filed bankruptcy, the court and the attorneys had a conversation with the attorney who filed the bankruptcy (transcript of the conversation is not in the record), that the bankruptcy case was closed in 2002, and the discharge took place "much earlier." (Tr. 355, 388, 390, 392). Thus, an amendment would not have been proper in this case.
 {¶ 80} Alternatively, in their reply brief, appellants argue that the trial court erred when it failed to require the joinder of the trustee prior to submission of the case to the jury. Julian argues that this was not a proper argument for the reply brief, because it was a new issue that was raised for the first time in the reply brief.
 {¶ 81} Julian is correct that no pleading with the trial court or with this court has asserted that joinder of the trustee was required. Thus, this argument will not be addressed. As we have previously stated "[a] reply brief is not to be used by an appellant to raise new assignments of error or issues for consideration; it is merely an opportunity to reply to the appellee's brief." Scibelli v. Pannunzio, 7th Dist. No. 02CA175, 2003-Ohio-3488, citing Sheppard v. Mack (1980), 68 Ohio App.2d 95, 97; App.R. 16(C). Thus, this argument also fails.
 {¶ 82} Secondly, even if we disregard the procedural defects in belatedly asserting the defense of estoppel, the record contains little information as to whether estoppel would even apply to this case. As was briefly explained above, from the testimony and evidence admitted at trial it can only be determined that Julian filed bankruptcy. (Tr. 355). The testimony in no way indicates whether she did or did not include her claim against appellants as an asset of the bankruptcy estate. The only information in the record comes from a sidebar discussion with the trial judge where appellants' attorney claims that it was not included as an asset of the bankruptcy estate and Julian's attorney claims Julian told the trustee about the lawsuit against appellants. (Tr. 392). Without more information in the record, it is unclear whether estoppel would apply.
 {¶ 83} Moreover, information as to whether the claim was listed as an asset of the bankruptcy estate could easily have been obtained by appellants given that bankruptcies are public record. Thus, if it really was not listed as an asset, then appellants could have obtained this information and tried to admit it into evidence at trial. However, appellants did not even attempt this. Given all the above, this assignment of error is without merit.
 ASSIGNMENT OF ERROR NUMBER FOUR {¶ 84} "Whether the trial court abused its discretion in awarding plaintiff $77,539.93 in attorney fees plus prejudgment interest."
 {¶ 85} There are two distinct arguments under this assignment of error. The first argument addresses the unreasonableness of the amount of attorney fees awarded, while the second addresses the grant of prejudgment interest. Each argument will be addressed separately.
 A. ATTORNEY FEES {¶ 86} An award of attorney fees is within the discretion of the trial court. Swanson v. Swanson (1976), 48 Ohio App.2d 85, 90. Absent an abuse of discretion, a reviewing court will not reverse the trial court's determination of attorney fees. Westfield Cos. v. O.K.L. Can Line, 1st Dist. Nos. C-030151, C-030197, C-030198, 2003-Ohio-7151, at ¶ 38. "If punitive damages are proper, the aggrieved party may also recover reasonable attorney fees." Columbus Finance, Inc., 42 Ohio St.2d at 183.
 {¶ 87} The trial court awarded Julian $77,539.93 in attorney fees. Appellants argue that the amount of attorney fees is unreasonable considering the factors enumerated in DR 21-6(B). First, they contend that 319.1 hours to work on a case that is trying only damages is unreasonable given that this case lacks complexity, i.e. it contained only common law claims and required no experts to testify. Next, appellants argue that given Julian's attorneys' experience and reputation the amount of time and hourly rates submitted were excessive and unreasonable. Lastly, appellants argue that the existence of a contingency fee arrangement, which would have allowed the attorneys to collect only $52,800, shows the amount given is excessive.
 {¶ 88} Julian rebuts these arguments by contending that the rates were reasonable especially given that liability was not stipulated until late in this case, thus, for a majority of the case her attorneys had to prepare for arguments on all her causes of action. Furthermore, she contends that the contingency agreement provides no basis for reducing an award of attorney fees.
 {¶ 89} DR 2-106(B) states "[a] fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee." In determining attorney fees, a trial court is first to calculate the number of hours reasonably expended on the case times an hourly fee, and then may modify that calculation by application of the factors listed in DR 2-106(B). Bittner v. Tri-County Toyota, Inc. (1991),58 Ohio St.3d 143. This disciplinary rule lists the factors to be considered in deciding the reasonableness of a fee as follows:
 {¶ 90} "(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
 {¶ 91} "(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
 {¶ 92} "(3) The fee customarily charged in the locality for similar legal services.
 {¶ 93} "(4) The amount involved and the results obtained.
 {¶ 94} "(5) The time limitations imposed by the client or by the circumstances.
 {¶ 95} "(6) The nature and length of the professional relationship with the client.
 {¶ 96} "(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
 {¶ 97} "(8) Whether the fee is fixed or contingent." DR 2-106(B).
 1. COMPLEXITY {¶ 98} Appellants argue that the 319.1 hours of time expended on this case is not reasonable given that it was not a novel case nor did it require a lot of skill. They contend Julian's counsel should not have billed for "receipt and review" of documents such as correspondence and court notices. They insist that this task is one that requires little or no expenditure of time on the part of counsel and could have been performed by paralegals. Furthermore, they argue that there are some problems with the billing statement, such as one attorney who did a block billing. Lastly, they contend that given the complexity of this case, it was unreasonable and excessive to bill for two attorneys for the trial.
 {¶ 99} These arguments do not show that the trial court abused its discretion in determining that 319.1 hours for this case was reasonable. First, the time expended on the "receipt and review" of documents was minimal, spending between one tenth and three tenths of an hour to review certain documents. Neither appellants' own expert nor Julian's expert could render an opinion on whether it was excessive or unreasonable. Appellants' own expert explained that different attorneys do it different ways. (6/24/03 Tr. 40).
 {¶ 100} Secondly, concerning the block billing that was used by one of Julian's attorneys, her expert stated that while the billing should have been done differently, expending 319.1 hours on a case like this was reasonable. (4/14/03 Tr. 68-69, 77). However, appellants' expert testified that some of these block billing times were unnecessary. (6/24/03 Tr. 36). Therefore, it became an issue as to what the trial court believed. The trial court is in the best position to evaluate witness credibility, and as such we will not disturb its finding. SeasonsCoal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80.
 {¶ 101} Furthermore, the trial court's determination that 319.1 hours expended on this case was justified, was not an unreasonable determination. While it is true that the trial was only on damages it was not until two months prior to trial that liability on all five causes of action were stipulated. This was over 2½ years after the complaint was filed and after numerous motions asserting defenses were filed. Therefore, preparation was needed on all causes of action asserted against appellants and on all defenses asserted by appellants. Moreover, Julian's attorneys were not just preparing for trial, but also for two civil contempt hearings for appellants' discovery violations. Thus, while the trial on damages in and of itself was not complex, the other factors involved in this case required additional time by Julian's attorneys.
 {¶ 102} Lastly, it was not unreasonable for the trial court to award attorney fees for the use of two attorneys for a trial on damages. Like above, there was conflicting testimony as to whether this was reasonable or not. (4/14/03 Tr. 79; 6/24/03 Tr. 38). However, as stated above, the trial court was in the best position to determine if this was reasonable. Id. Despite the fact that the trial was just on damages, the history of this case reveals that appellants were fighting tooth and nail on all issues of discovery and liability (up until the stipulation was entered into). This highly adversarial attitude and history may indicate a reservation on the part of Julian's attorneys to be prepared for whatever may happen at trial (like appellants trying to withdraw the stipulation).
 2. EXPERIENCE {¶ 103} Appellants next assert that given the experience and reputation of Julian's attorneys the amount of time and hourly rates submitted on this was unreasonable. The amount of time spent on this case is adequately addressed above. As to the rates, Julian's attorneys submitted bills for $250 an hour for two of the attorneys and $175 an hour for the other two attorneys who worked on this case.
 {¶ 104} Julian's expert testified that in federal and state employment related litigation his base rate is $275 an hour and that this is well within the range of hourly rates charged with his level of experience. (4/14/03 Tr. 39). He stated that given his experiences, the rates charged by Julian's attorneys were within the range of hourly rates in the area given their level of experience. (4/14/03 Tr. 45-46). Appellants' expert did not directly give an opinion as to whether $250 an hour was in the range of reasonable attorney fees. Rather, he testified that for the $160,000 verdict, around $33,000 would be more consistent with one-third of the total verdict (implying that the contingency fee agreement should be used, which is addressed below). (6/24/03 Tr. 43). Without more to support appellants' contention that $250 an hour is unreasonable, we cannot conclude that the trial court abused its discretion in using this number. Crow v. Fred Martin Motor Co., 9th Dist. No. 21128, 2003-Ohio-1293, at ¶ 51 (discussing reasonableness of a $250 an hour fee and the appellate court was unable to conclude that the trial court abused its discretion in finding this hourly fee reasonable).
 3. CONTINGENCY FEE AGREEMENT {¶ 105} Lastly, appellants argue that the award of attorney fees by the court should not exceed the amount that was agreed upon in the contingency agreement. Julian and her attorneys entered into a contingency agreement prior to the litigation. The contingency agreement was for one-third (33%) of the award if counsel was successful. One-third (33%) of $160,000 is $52,800.
 {¶ 106} Julian argues that while a contingency fee agreement was in place, it is a consideration for increasing, not decreasing the attorney fees award. Julian relies on a statement made in B-Right Trucking Co. v.Interstate Plaza Consulting, 154 Ohio App.3d 545, 2003-Ohio-5156. In that case we stated, "The court is not to award attorney fees in the claimed amount merely because that was the amount agreed upon between the party seeking fees and its attorneys. See Galmish [v. Ciccihini], 90 Ohio St.3d [22] at 35." B-Right was a fixed fee agreement. However, Galmish, upon which we relied, was a contingency fee agreement. In Galmish, the trial court awarded attorney fees in the amount of one-third of the verdict. The Supreme Court upheld this award stating that the trial court did not merely rely on the contingency agreement in setting the attorney fees, but rather considered all the factors in DR 2-106(B). Id. Given this statement, a contingency fee agreement is not necessarily controlling. If other factors suggest that the fee should be more than the contingency fee (or even the fixed fee agreement), then the trial court does not abuse its discretion by so holding. Accordingly, the trial court did not abuse its discretion in the award of attorney fees and the argument of appellants lacks merit.
 B. PREJUDGMENT INTEREST {¶ 107} R.C. 1343.03(C) states:
 {¶ 108} "Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case.
 {¶ 109} "The award of prejudgment interest encourages the `settlement of meritorious claims, and the compensation of a successful party for losses suffered as the result of the failure of an opposing party to exercise good faith in negotiating a settlement.' Lovewell v. PhysiciansIns. Co. of Ohio, 79 Ohio St.3d 143, 147, 1997-Ohio-175; see, also,Kalain v. Smith (1986), 25 Ohio St.3d 157, 159. Therefore, an injured party in a tort action is, under appropriate circumstances, entitled to recover interest from the date the cause of action accrues." Andre v.Case Design, Inc., 154 Ohio App.3d 323, 2003-Ohio-4960, at ¶ 7.
 {¶ 110} The Supreme Court has held that a trial court should not award prejudgment interest where the tortfeasor (1) fully cooperated in discovery, (2) rationally evaluated risks and potential liability, (3) did not attempt to delay the proceedings unnecessarily, and (4) made a good-faith monetary settlement offer or responded in good faith to an offer from the other party. See Kalain, 25 Ohio St.3d at 159; Champ v.Wal-Mart Stores, Inc., 1st Dist. No. C-010283, 2002-Ohio-1615.
 {¶ 111} The burden is on the party seeking prejudgment interest to demonstrate that the tortfeasor failed to make a good-faith effort to settle the case. See Moskovitz, 69 Ohio St.3d at 659. For purposes of prejudgment interest, a lack of "good faith" is not the equivalent of "bad faith." See Kalain, 25 Ohio St.3d at 159. Whether a party's settlement efforts were made in good faith is a decision committed to the sound discretion of the trial court. See Moskovitz, 69 Ohio St.3d at 658. Abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. See Huffman v. Hair Surgeon, Inc. (1985), 19 Ohio St.3d 83, 87. Absent an abuse of discretion, the trial court's decision to award prejudgment interest should not be reversed on appeal. See Kalain,25 Ohio St.3d at 159.
 {¶ 112} The trial court found that Julian made a good faith effort to settle, while appellants failed to make a good faith effort to settle. Accordingly, the trial court awarded prejudgment interest to Julian. In the journal entry, the trial court supported this decision by stating that on July 28, 2000, at a pretrial conference Julian made a settlement demand of $110,000. The trial court then stated that appellants did not make any financial settlement offer until the commencement of trial and this offer was for $10,000. The trial court explained that this settlement offer was not meaningful, but rather was made as an attempted effort to avoid prejudgment interest. The trial court explained that in looking at the four factors set forth in Kalain, it was apparent that appellants failed to meet any of the standards of good faith by stating the following:
 {¶ 113} "3. Defendants were dilatory in responding to Plaintiff's discovery requests, requiring two motions to compel. Defendant Anthony Pannozzo was even incarcerated for his failure to comply with this Court's discovery orders.
 {¶ 114} "4. Defendants asserted numerous baseless defenses before stipulating to liability, including accord and satisfaction. Defendants' actions caused needless additional discovery and trial preparation." 6/27/03 J.E.
 {¶ 115} While appellants acknowledge that they did not fully cooperate in discovery, they claim that this factor alone should not be the sole reason for awarding prejudgment interest. They argue that the $10,000 offer of settlement was one-third of the actual loss of Julian (as stated above she testified at trial that during the year she was terminated she lost approximately $30,000 in wages). Thus, they claim that this settlement offer cannot be considered in "bad faith." Julian argues since liability was stipulated at the point when the offer was made, offering one-third of the amount of what they term to be actual damages, does not constitute a good faith effort to settle.
 {¶ 116} Appellants' argument that their settlement offer cannot be considered bad faith is an incorrect statement of the applicable standard. The standard used is whether there was a lack of a good faith effort to settle. Kalain, 25 Ohio St.3d 157. As explained above, the lack of good faith in this determination does not necessarily constitute bad faith. Id. Thus, the determination is whether the offer of $10,000 is evidence of a lack of good faith effort to settle.
 {¶ 117} We find that the trial court did not abuse its discretion in finding that appellants failed to make a good faith effort to settle. Appellants stipulated to liability. A $10,000 settlement offer was not made until the eve of trial. However, they acknowledge that actual losses were approximately $30,000. Furthermore, the stipulation was not entered into until approximately two months prior to trial and approximately 2½ years after the complaint was filed, in which time numerous defenses were asserted, only to be abandoned. Also, the record reveals that two motions to compel were filed and that Dr. Pannozzo was found in civil contempt and sent to jail for his failure to comply with the discovery orders. Thus, considering all of these factors in conjunction with each other, sufficient justification existed to support the trial court's award of prejudgment interest. Thus, this argument lacks merit.
 {¶ 118} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
Waite, P.J., concurs.
DeGenaro, J., concurs.